**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN J. CONNER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10-cv-5312 |
| | ) | |
| v. | ) | Magistrate Judge Cox |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Karen J. Conner ("Conner"), seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for a period of disability and for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").[2] Conner has filed a Motion for Summary Judgment [dkt. 24], seeking a judgment reversing or remanding the Commissioner's final decision. For the reasons set forth below, Conner's motion is granted.

I.      PROCEDURAL HISTORY

On May 10, 2008, Conner filed an application for DIB, alleging a disability onset date of September 24, 2007.[3] The SSA denied her application initially, and again upon reconsideration.[4] Thereafter, Conner filed a timely written request for a hearing, which was granted.[5] On September 14, 2009, a hearing was conducted before Administrative Law Judge ("ALJ") Lovert F. Bassett in

---

[1] On January 12, 2011, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (dkts. 10, 12).

[2] *See* 42 U.S.C. §§ 416(i), 423.

[3] R. at 147.

[4] R. at 91, 96.

[5] R. at 100.

Evanston, Illinois.[6] During the hearing, the ALJ heard testimony from Conner, as well as vocational

expert ("VE"), William Newman, and medical expert ("ME"), Mark Overlander, Ph. D.[7]

On September 28, 2009, the ALJ issued an unfavorable decision finding that Conner was not

disabled under the Act.[8] On September 25, 2009, Conner appealed the ALJ's determination to the

Appeals Council of the SSA, who denied Conner's request on June 22, 2010,[9] making the ALJ's

ruling the final decision of the Commissioner.[10] Conner filed this action on August 23, 2010.[11]

II.      STATEMENT OF FACTS

We now summarize the administrative record. We set forth the background evidence of

Conner's history and medical complaints, followed by the objective medical evidence considered

by the ALJ. We then discuss the hearing testimony, before addressing the ALJ's written opinion.

A.       Introduction and Medical Evidence

Conner was born on September 26, 1950, making her fifty-nine years old on the date that the

ALJ issued his decision.[12] After graduating from high school, she worked at Underwriters

Laboratory ("UL") for 37 years, where she attained the position of senior engineering assistant.[13]

Conner was terminated from UL in August 2008, after taking an extended medical leave of absence

---

[6] R. at 19-55.
[7] *Id.*
[8] R. at 76-90.
[9] R. at 10-11.
[10] R. at 1-3; 20 C.F.R. § 404.981; *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).
[11] Pl.'s Compl. (dkt. 6).
[12] R. at 147.
[13] R. at 23, 48, 59, 164, 167.

due to her emotional breakdowns at work.[14] Conner claims she can no longer work due to anxiety, depression, a stress disorder, high blood pressure, and gastroesophageal reflux disease ("GERD").[15] Conner has been divorced three times and has three grown children.[16] At the time of the hearing, she was living alone in Lakemoor, Illinois.[17]

We begin our review of Conner's relevant medical history on October 24, 2007, one month after the alleged disability onset date. Conner, who was then on medical leave for depression,[18] received an initial evaluation from psychiatrist Steven J. Resis, M.D on that date.[19] She related crying frequently and being unable work under her current stress level.[20] Conner reported that her regular physician, Mackie Snebold, M.D., had prescribed her increasing dosages of Fluoxetine, and that she had experienced two remote nervous breakdowns and one remote hospitalization.[21] Dr. Resis described Conner as "an anxious, tearful, slightly overweight white female" who experienced some difficulties with memory, concentration, and focusing on a topic, but whose speech was "generally clear and coherent."[22] Dr. Resis noted that Conner's judgment and insight appeared fair, and that her motor exam was normal.[23] He diagnosed Conner with "Major Depression, recurrent of moderate to severe severity" and ruled out "Bipolar Disorder NOS" and "Anxiety Disorder NOS."[24] Dr. Resis increased Conner's dosage of Prozac from 60 mg to 80 mg and continued her on

---

[14] R. at 48, 163.
[15] *Id.*
[16] R. at 24-31.
[17] R. at 37.
[18] *Id.*
[19] R. at 232-233.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] R. at 233

Lorazepam for her anxiety.[25]  Dr. Resis also assigned Conner a Global Assessment of Functioning ("GAF") score of 55[26] and referred her to Nancy Peterson Walz LCSW, ACSW, for counseling.[27]

On November 27, 2007, Dr. Resis noted that, although Conner was crying somewhat less on her increased dosage of Prozac, she was still crying fairly often and having ongoing issues with memory, concentration, and getting things done.[28] Conner reported waking and feeling very anxious and worried about the things she needed to do.[29] Dr. Resis anticipated that Conner would return to work by mid-December 2007.[30] On November 21, 2007, Dr. Resis noted Conner's report of "intense anxiety" since "working on some important issues" in counseling which troubled her.[31]

On December 12, 2007, Dr. Resis noted that, while Conner was doing "somewhat better," she was "quite terrified" of returning to work "due to sleep disturbance and anxiety and fears."[32] On January 9, 2008, Dr. Resis noted Conner's report that she could return to work, "but was not particularly optimistic that she can do well in the current environment," was tolerating her current medication, and had found counseling helpful.[33]  On January 30, 2008, Dr. Resis noted that Conner was struggling intensely with interpersonal issues at work, feared being "pushed out of [UL] due to their being very negative towards her," was doing fairly well on 80mg of Prozac and in counseling.[34] Dr. Resis also noted that Conner's energy was okay outside of work and she was generally sleeping

---

[25] *Id.*
[26] For reference, the GAF scale is used by mental health professionals to convey a person's psychological, social, and occupational functioning on a spectrum in which scores between 41-50 indicate serious, 51-60 indicate moderate, and 61-70 indicate mild symptoms.
[27] *Id.*
[28] R. at 231.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

alright, other than when worrying excessively about work.[35]

On February 11, 2008, Dr. Resis noted his report to a Cigna doctor that Conner was doing fairly well with her activities of daily living, but would not do well if she returned to work under her current supervisor.[36] Dr. Resis futher noted his report that, "if there are no changes in the situation," Conner may be able to return to work in the next two months.[37] On February 15, 2008, Dr. Resis noted that Ms. Walz had informed him that Conner did not have a suicidal plan, but was "very distressed about the possibility of having to return to work."[38] On February 19, 2008, Conner was seen by Dr. Resis on an emergency basis due her struggling with suicidal ideation.[39] After she reported a remote suicide attempt, Dr. Resis reviewed coping strategies with Conner and continued her on 80 mg of Paxil, with a trial pack of Lamictal augmentation.[40] On February 27, 2008, Dr. Resis noted that Conner was highly anxious, especially when discussing returning to work under her previous supervisor.[41] She denied any suicidal ideation and showed some slight improvement with Lamictal.[42] Dr. Resis continued Conner on Prozac and Lamictal in the morning.[43]

On March 12, 2008, Dr. Resis noted that Conner was "intensely dysphoric and tearful throughout the session," had significant difficulties with day to day functioning, and reported feeling more agitated since taking the Lamictal.[44] Dr. Resis continued Conner on Prozac and advised her

---

[35] *Id.*
[36] R. at 229.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] R. at 228.
[42] *Id.*
[43] *Id.*
[44] *Id.*

to discontinue Lamictal and take Seroquel at night.[45]  On March 19, 2008, Dr. Resis noted Conner's report that the Seroquel was helping her sleep without nightmares, and that she was agitated and distraught at times, but doing better.[46]  Dr. Resis also noted Conner's statements that she would be unable to return to work at UL, and would be seeking an independent psychiatric evaluation for long-term disability.[47]  On May 7, 2008, Dr. Resis noted that Conner was struggling with significant anxiety, and had reported "some periodic nightmares about working at UL.[48]  On June 4, 2008, Dr. Resis noted that Conner's mood had stabilized without any active suicidal ideation, and she was sleeping well Prozac.[49]  During the past four visits, Conner was continued on her medication.[50]

On August 6, 2008, Dr. Resis noted Conner's report of financial difficulties and concerns about her job at UT, and that she was crying on daily, with clear impairments.[51]  Due to financial concerns, Dr. Resis lowered Conner's Prozac dosage from 80mg to 40mg, and gave her a one month supply of 30 mg of Cymbalta.[52]  On October 1, 2008, Dr. Resis noted Conner's report of several incidents of significant difficulties with stress and functioning.[53] Dr. Resis also noted that Conner had stopped seeking counseling for financial reasons.[54]  Conner agreed to continue on 30mg of Cymbalta, and switch it from the evening to the morning, and also lower her Prozac to 20mg.[55]

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] R. at 227.
[51] R. at 234.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*

In notes from October 2007, Dr. Resis listed Conner's symptoms as frequent crying, anxiety, mood instability, sleep disturbance, insomnia / impaired memory and concentration.[56]  He further noted that examinations revealed fatigue, sad behavior, blunted affect, sad/angry thought content, and decreased memory and recall problems, and that Conner had decreased her interaction with friends.[57]  However, he also noted that Conner's language comprehension and expression were good and her activities of daily living were normal.[58]  Dr. Resis assigned a current GAF score of 55, noting that Conner's highest score in the past year had been 80, and her baseline score – denoting her usual ability to function – was 85.[59]  Dr. Resis opined that Conner "needs to improve significantly before returning to work."[60]  In notes from November and December 2008, Dr. Resis described Conner similarly, but assigned her a current GAF score of 60, with her highest and baseline score for the past year being 75.[61]  He noted that her activities of daily living were "ok," and that she was unable to "work in current work environment," but exclaimed that performing Conner's job duties in an alternative work setting was "possible!"[62]

Conner saw Ms. Walz on a weekly to bi-monthly rate from November 2007 through April 2008.[63]  The notations of Ms. Walz show that Conner reported poor sleep, appetite, memory and concentration, depressed mood and anxiety, and a history of suicide attempts.[64]  Ms. Walz noted greatly diminished capacity and assessed a severe major depressive disorder.[65]  Mental examinations

---

[56] R. at 295 -296.
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] R. at 297.
[61] R. at 298.
[62] R. at 299-300.
[63] R. at 324-41.
[64] *Id.*
[65] *Id,*

revealed blunted, flat and anxious affect, and little improvement in her depression and instability.[66]

On April 16, 2008, Ms. Walz completed a mental residual functional capacity assessment ("RFC"), listing Conner's diagnosis as "Major Depressive Affective Disorder, Moderate to Severe, with a GAF of 45-50."[67] Ms. Walz described Conner's symptoms as depression, feeling hopeless and overwhelmed, experiencing anxiety, suicidal thoughts, crying, poor sleep, difficulty structuring and organizing daily activities, inconsistent stability, decreased energy, mood disturbance, difficulty concentrating, bipolar syndrome, irrational fears, intense and unstable relationships, and manic syndrome.[68] She also noted that Conner had "issues with her current supervisor" and assessed Conner as unable to meet competitive standards in maintaining regular attendance, complete a normal workday or workweek without interruptions due to her symptoms, deal with normal work stress, deal with stress of semiskilled and skilled work, travel in unfamiliar places and use public transportation.[69] Ms. Walz also reported that Conner was seriously limited – but not precluded – in several other areas, including understanding and remembering simple instructions, performing at a consistent pace and responding appropriately to work changes.[70] She opined that Conner would miss two to four work days per month because of her symptoms.[71]

On June 18, 2008, Dr. Snebold, who had seen Conner two to three times yearly since 1989, completed a psychiatric report.[72] Dr. Snebold noted a September 25, 2007 phone call from Connor complaining of extreme anxiety and being unable to work, tearful, and emotional.[73] Dr. Snebold

---

[66] *Id.*
[67] R. at 307-311.
[68] R. at 308.
[69] R. at 309-310.
[70] *Id.*
[71] R. at 311.
[72] R. at 242-248.
[73] R. at 242.

further noted Conner's daily activities as driving once per week to go shopping, watching one movie per day, reading with a short attention span, and becoming very tense when going out to the mailbox.[74] Dr. Snebold also noted Conner's personal problems with coworkers who continued to send her letters from work.[75] Dr. Snebold opined that Conner's work led to increased symptoms and diagnosed her with depression and anxiety, noting that she has few coping mechanisms.[76]

Dr. Snebold also completed an Arthritic Report, which also noted depression and anxiety with an onset date of 2001 and exacerbation during September 2007.[77] Dr. Snebold noted tenderness in Conner's right medial knee after extensive walking, and pain in her great right toe secondary to trauma.[78] Dr. Snebold opined that Conner is able to stand, walk, or sit for one hour at a time.[79] He also noted that she must be able to walk around during an eight-hour day, and a job which permits shifting positions at will from sitting, standing, and walking would be "preferred."[80]

On June 23, 2008, State agency non-examining reviewer, Dr. Campa, completed a form indicating the presence of a "Major Depressive Disorder."[81] Dr. Campa also indicated that Conner had no restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration.[82] In his RFC assessment, Dr. Campa indicated that Conner is moderately limited in her ability to understand, remember, and carry out detailed instructions,

---

[74] *Id.*
[75] *Id.*
[76] R. at 243, 245.
[77] R. at 246-48.
[78] R. at 246.
[79] R. at 247.
[80] R. at 248.
[81] R. at 252.
[82] *Id.*

maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.[83]  Dr. Campa also noted moderate limitations in Conner's ability to: complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.[84]

On July 17, 2008, Conner underwent a consultative examination with Gurbax Saini, M.D., regarding her anxiety and depression.[85]  Dr. Saini reported that Conner was crying throughout the entire interview and had related being picked on by her coworkers.[86]  Conner denied any history of nausea, vomiting, diarrhea, chest pain, shortness of breath, loss of consciousness, fever or chills.[87] Dr. Saini assessed Conner with hypertension, dyspepsia, anxiety and depression.[88]

On July 31, 2008, Conner received an independent medical evaluation from Thomas Rebori, M.D.[89]  After reviewing Conner's medical history, Dr. Rebori opined that Conner's affect was tearful but appropriate, her mood was depressed and her thought process was tangential and circumferential at times.[90]  In Dr. Rebori's accompanying letter dated September 12, 2008, he listed Conner's diagnosis as Major Depression, Recurrent, Severe (296.33) and Anxiety Disorder NOS.[91]

---

[83] R. at 263-64.
[84] R. at 264.
[85] R. at 267-68.
[86] R. at 267.
[87] *Id.*
[88] R. at 267-268.
[89] R. at 272-84.
[90] R. at 272-77.
[91] R. at 284.

Dr. Rebori stated that Conner has poor concentration and ability to maintain an appropriate affect or interact appropriately in a work environment.[92]  He further opined that Conner's illness had not responded to treatment despite initial attempts to augment her medication, but that she might benefit from more aggressive medication trials.[93]  Dr. Rebori concluded that Conner was disabled "as her mood disorder interferes with her ability to function in all spheres of her life including personal social interactions much less in a work environment with even minimal stress or expectations."[94] He also cautioned that Conner "is at risk for her mood disorder worsening with potentially severe consequences" and urged her to continue to attempt additional treatment modalities.[95]

On January 6, 2009, Conner saw Dr. Snebold for a follow-up, where he noted she was tearful, upset, and suffering from depression.[96]  Her blood pressure was elevated, recording at 152/106.[97]  Dr. Snebold's records also noted some edema.[98]  In a letter to Conner's attorney dated May 18, 2009, Dr. Resis stated that much of Conner's disability was related to her interpersonal sensitivity, that her depression appears to be sufficiently treated with medication, and that, without ongoing counseling, Conner would likely have issues with other supervisors in the future.[99]  Dr. Resis also opined that Conner would not likely "meet the full criteria for psychiatric disability."[100]

## B.    The September 14, 2009 Hearing

Conner's hearing before the ALJ occurred on September 14, 2009, in Evanston, Illinois.

---

[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id*.
[97] *Id.*
[98] R. at 336.
[99] R. at 233.
[100] *Id.*

Conner appeared in person and was represented by attorney, Kimberley A. Jones. The ALJ heard testimony from Conner, as well as vocational expert ("VE"), William Newman, and medical expert ("ME"), Mark Overlander, Ph.D.

Conner testified first. She stated that she went to work for UL after graduating from high school in 1968.[101] During her 37 years there, Conner acquired her job skills and upgraded through several different positions to become a senior engineering associate.[102] Conner described her duties at UL as "project handling, working with clients, and setting up [the clients'] project or product."[103] She stated that, after setting up a project, she would submit a lab request, and then review and report on any results.[104]

Conner also testified at length about her three failed marriages and a previous relationship. She explained that her first marriage, which began in 1968 and produced one son, ended because she "[m]arried too young" and her ex-husband, who was physically abusive,[105] had treated her like a servant.[106] Conner stated that her second marriage, which began in 1978 and produced two daughters, ended in 1989 because she and her former spouse – who was verbally and physically abusive[107] – had "drifted in different directions."[108] Conner then related that she married again in 1992, but her third husband withdrew into himself and began using marijuana after his eleven-year-old son from a previous relationship developed cancer.[109] Conner explained that, after her third and

---

[101] R. at 22-23.
[102] R. at 23, 48.
[103] R. at 23.
[104] *Id.*
[105] R. at 40-42.
[106] R. at 25.
[107] R. at 42-43.
[108] R. at 29.
[109] R. at 33.

final marriage ended in 1998,[110] she dated a "bipolar" gentleman for several years, whom she described as verbally and physically abusive.[111] Conner stated that, while this gentleman initially made threatening phone calls to Conner after their relationship ended, she had not heard from him in many years.[112] Conner stated that her unsuccessful romantic relationships have given her a negative feeling toward men.

With respect to her job, Conner testified that she began crying frequently at work, having frequent absences, and one day "called [her] boss and told them [she] was having a meltdown and wouldn't be in [to work]."[113] Conner explained that she initially intended to make up for her absences, but her supervisor did not allow it.[114] According to Conner, another supervisor told her she "was lucky [she] was still there with the work [she] was doing."[115] These statements made Conner feel as though her status at the company was shaky.[116] When asked whether her crying spells were caused by her own self-appraisal, Conner responded: "I think a lot of it probably would be that. I think I'm not living up to my own standards."[117]

The ME, a clinical psychologist, then questioned Conner.[118] When asked why she was unable to work, Conner responded:

> I don't like to focus, being worried about not having a job. I was doing a lot of crying at my desk. And when I sit there in front of the computer and I get like unfocused, I'd start thinking about the train that I took to and from work. And instead of getting on it, walking

---

[110] R. at 31.
[111] R. at 45-45.
[112] R. at 46.
[113] R. at 38-39.
[114] R. at 39.
[115] *Id.*
[116] *Id.*
[117] R. at 40.
[118] R. at 47.

in front of it.[119]

The ME then asked Conner to tell the ALJ how she spends a typical day.[120] Conner explained that she will get up before noon, lay in bed "with thoughts rushing through [her] mind," let the two dogs outside, clean the house, do yard work during nice weather, and watch television. Conner added that she likes to read but has a problem focusing.[121] When asked, Conner stated that she likes to read "[p]retty much everything," but especially mysteries and ghost stories on her Kindle.[122]

The ME then asked Conner if she would be able to work in a "very routine central office type job" away from UL.[123] Conner responded that she might be able to if the work was independent, and she would not have to interface with too many other people.[124] When asked, Conner stated that UL had terminated her in August 2008, and her long term disability ended in March 2009, causing her to stop seeing Ms. Walz in either 2008 or the summer of 2009.[125] After the ME referenced a March 13, 2009 letter from Ms. Walz stating that Conner last saw her on February 15, 2008, Conner's counsel stated that Conner's had also visited Ms. Walz on November 19, 2008.[126]

The ME then summarized the objective evidence, noting that Conner had two psychiatric treating sources, Dr. Resis and Ms. Walz, as well as a consultative source, Dr. Rebori, who identified Listings 12.04 and 12.06, and assigned a GAF score of 45, indicating a "moderately severe level of functional impairment."[127] The ME noted that the record also contained objective evidence from

---

[119] *Id.*
[120] *Id.*
[121] R. at 47-48.
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] R. at 52.
[127] R. at 53.

Conner's primary care provider, Dr. Snebold.[128]  The ME futher noted that Dr. Snebold's most recent report observed that Conner was "not tearful but [] upset over insurance issues, otherwise feels okay," denoting mostly non-psychiatric issues.[129]

The ME observed a " variance" between Dr. Resis's reports and those of Ms. Walz.[130]  The ME noted that, in the beginning of 2008, Ms. Walz frequently reported "no improvement, continued depressed mood, minimum improvement, very depressed, some suicidal thoughts," and by spring 2008, Ms. Walz reported improved sleep, but high anxiety.[131]  The ME noted that Dr. Resis, by contrast, assigned a current GAF score of 55 in October 2007, with the highest score in the past year of 80 and a baseline score of 85, then in December of 2008, assigned a current GAF score of 60, with the highest score in the past year being 75.[132]  The ME stated that "this is in sharp contrast" with what Ms. Walz provides in her summary statement," namely that Conner's current GAF score was 55, with her highest GAF score in the past year being 45 to 50.[133]  The ME observed that this "actually doesn't make sense."[134]

Then, based on Ms. Walz's checklist noting manic syndrome, the ME asked Conner to describe her manic periods; who replied that there were none.[135]  The ME then referenced Ms. Walz's RFC assessment, in which Ms. Walz included notations indicating that Conner had issues with her current supervisor and was not properly trained for her job.[136]  Next, the ME read from Dr.

---

[128] *Id.*
[129] R. at 54.
[130] *Id.*
[131] R. at 55.
[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] R. at 55-56.
[136] R. at 56.

Resis's May 15, 2009 letter stating: "I do not feel that [Conner] would likely meet the full criteria for psychiatric disability on the basis of a diagnosis of a major depression, but I would expect that without ongoing individual counseling, she would not be successful taking feedback from any supervisors in various worksettings."[137]  The ME noted Dr. Resis's statement in the letter that Conner's current disability was related to her "interpersonal sensitivity generally" and "not particularly responsive to medication."[138]

In his assessment, the ME identified Listings 12.04 (major depressive disorder) and 12.06 (anxiety related disorder).[139]  In a combined Paragraph B analysis, the ME opined that Conner had moderate restriction in her activities of daily living and moderate difficulties in maintaining social functioning, as well as concentration, persistence, or pace.[140]  The ME found no documented episodes of decompensation of extended duration.[141]  The ME opined that Conner "does retain the cognitive, mental capacity to engage in less than extremely stressful simple work activities which do not involve extensive interaction with co-workers or male supervisors."[142]  The ME also concluded that no special allowance needs to be made for contact with the public.[143]

Finally, the ME stated that Conner did not meet the Paragraph C criteria, as she "continues to live independently," and the ME did not believe a change in environment would cause Conner to become displaced or require a highly supportive living environment.[144]

---

[137] Id.
[138] R. at 57.
[139] Id.
[140] Id.
[141] Id.
[142] Id.
[143] R. at 57-58.
[144] R. at 58.

The VE testified next.[145]  He classified Conner's engineering job as that of a project manager within the Dictionary of Occupational Titled ("DOT"), which is skilled, sedentary work.[146]  The VE stated that Conner's job required a high level of communication with co-workers and supervisors.[147]

The ALJ then sought the VE's opinion on a hypothetical individual.  In this hypothetical, the ALJ described a 59-year-old woman with a high school education and "a skilled work history but nothing transferrable to other skilled occupations, who has no exertional limitations but should not be placed in a position where there would be high levels of interaction with co-workers and supervisors, although dealing with the general public would be permissible, and preferable "if the general public customer base did not have a lot of people of the male gender in it."[148]

The VE stated that unskilled jobs exist for this hypothetical individual, which generally do not involve a high level of interaction with coworkers or supervisors.[149]  The VE noted, however, that there was nothing statistically to refer to exclude contact with a male supervisor.[150]  The VE stated that the individual could perform, as portrayed in the DOT, the 38,000 Illinois jobs of, dining room attendant (DOT 311.667-018), 36,700 jobs of laundry laborer (DOT 316.687), and  26, 800 jobs of order filler (DOT 922-687-058).[151]  The VE testified that all three representative jobs required only limited interaction with supervisors and co-workers.[152]

The ME then clarified that Conner can work with male co-workers, but less than extensive

---

[145]  *Id.*
[146]  R. at 59.
[147]  *Id.*
[148]  R. at 60.
[149]  *Id.*
[150]  *Id*.
[151]  R at 62-63.
[152]  R. at 65.

contact with male co-workers would be preferable.[153]   The ME testified, however, that Conner would be able to perform the proffered jobs, even if all co-workers and supervisors were male.[154]

Conner's counsel then asked the VE to explain what the proffered jobs entail.[155]   The VE replied that the unskilled jobs all involved simple, routine tasks and had a specific vocational preparation ("SVP") time of two; a dining room attendant, for example, would only have to bus tables and place the dishes in a dishwasher.[156]   The VE testified that someone who would be off task for ten to fifteen minutes per hour due to moderate limitations in concentration, persistence, and pace could not perform the proffered jobs.[157]   In response to counsel's questions, the VE also stated that someone who cried twice every hour, to the extent that they were off task from five to ten minutes per hour, could not perform the jobs, and neither could someone who left one hour early every week.[158]   The VE also added, however, that the jobs involved minimal stress.[159]

The VE and the ALJ then established that Conner had no transferrable skills from her work at UL for the proffered jobs.[160]   The ALJ observed that, as a woman of advanced age with a high school education, Conner would be disabled under the guidelines if she were exertionally limited to light work.[161]   However, this would not apply if Conner could perform medium work.[162]

---

[153] *Id.*
[154] R. at 66.
[155] *Id.*
[156] R. at 66-67.
[157] R. at 67.
[158] R. at 68-69.
[159] R. at 67.
[160] R. at 70.
[161] R. at 72.
[162] *Id.*

III.    THE ALJ'S DECISION

In his September 28, 2009 opinion, the ALJ applied the Act's sequential five-step analysis and found that Conner was not disabled within the meaning of the Act and, therefore, was not entitled to DIB or a period of disability.[163]  To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[164] Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy.[165]

The Social Security regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled.[166]  During this process, the ALJ must determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[167]  A finding of disability requires an affirmative answer at either step three or step five, while a negative finding at any step other than step three

---

[163]  R. at 79-90.
[164]  42 U.S .C. § 423(d)(1)(A).
[165]  42 U.S.C. § 423(d)(2)(A).
[166]  20 C.F.R. § 404.1520(a)(4).
[167]  *Id.*

precludes a finding of disability.[168]

As an initial matter, the ALJ determined that Conner met the insured status requirements of the Act through December 31, 2012.[169] At step one, the ALJ found that Conner had not engaged in any substantial gainful activity since September 24, 2007, the alleged disability onset date.[170] At step two, the ALJ found that Conner suffered from the following severe impairments: major depression disorder and generalized anxiety disorder, not otherwise specified.[171] The ALJ concluded that Conner's hypertension and GERD were not severe because Conner was never hospitalized or forced to undergo invasive treatment for these ailments and Dr. Saini, a consultative examining internist, had not noted any abnormalities in this regard.[172]

The ALJ then concluded at step three that Conner lacked any impairment or combination of impairments meeting or medically equaling those listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[173] The ALJ observed that the paragraph B criteria of Listings 12.04 and 12.06 could only be satisfied if Conner's mental impairment resulted in at least two of the following four limitations: "(1) marked restriction in the activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration."[174]

While relying on treatment notes from Ms. Walz and Dr. Resis, the ALJ found that Conner had "no more than moderate restriction" in her activities of daily living and "no more than moderate

---

[168] *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).
[169] R. at 81.
[170] *Id.*
[171] *Id.*
[172] *Id.*
[173] R. at 82.
[174] *Id.*

difficulties" in social functioning.[175]  The ALJ also found that Conner had "no more than moderate" difficulties with concentration, persistence, and pace, based on Dr. Resis's notations that Conner had difficulty concentrating, but was also able to care for herself, manage her own finances, and play scrabble and crossword games.[176]  Finally, the ALJ found that the record did not establish that Conner had experienced any documented episodes of decompensation of extended duration.[177]  As a result, the ALJ concluded that the paragraph B criteria were not satisfied.

The ALJ also determined that the paragraph C criteria were not met.  For Listing 12.04, he concluded that the evidence failed to show that Conner had a medically documented affective disorder of at least two years' duration that caused more than minimal limitation in her ability to do basic work activities, with signs of symptoms currently attenuated by medication or psychosocial support, and at least one of the enumerated 12.04(c) critera.[178]  For Listing 12.06, the ALJ concluded that the objective medical evidence did not establish decompensation of an extended duration or "a complete inability to function outside of the claimant's home."[179]

Next, the ALJ assessed Conner's RFC.[180]  The ALJ concluded that Conner could perform a full range of work at all exertional levels, but with the following non-exertional limitations: "[Conner] is able to understand, remember, and execute only simple instructions and also able to interact with co-workers and supervisors, but on no more than a moderate level."[181]  In reaching this conclusion, the ALJ noted that he had considered all of Conner's symptoms and the extent to which

---

[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] R. at 83.
[179] *Id.*
[180] *Id.*
[181] *Id.*

they comported with the objective medical evidence and other medical evidence,[182] as well as the opinion evidence.[183]

The ALJ noted Conner's testimony that: her symptoms "affect her concentration, cause her to cry when feeling overwhelmed, triggered a suicide attempt, and make it difficult for her to sleep;" her inability to work causes financial stress so that "she bathes, cares for her hair, and makes meals less frequently to conserve money," and "her low self-esteem, past abuses from her ex-husbands, and stress at work all contributed to her impairments."[184]

The ALJ also noted that Conner's activities of daily living included caring for her dogs, doing chores, paying bills, and driving to run errands, shop, or see her doctors.[185] The ALJ noted Conner's report that she could play with her dogs, watch television, and "read and walk when her 'depression and anxiety are minimal," as well as manage her personal needs and finances.[186] The ALJ also noted that Conner could talk on the telephone, spend time with others, and travel places alone.[187] The ALJ further noted Conner's testimony that she does not get along with others and does not handle stress or adjusting to change well, but may be able to perform work independently without close interaction with others.[188] The ALJ observed that Conner's "attention span varies according to her activities and she follows simple spoken instructions fairly well."[189] The ALJ also noted a letter from Conner's daughter which described her past suicide attempt, inability to sleep,

---

[182] *Id.*; *see* 20 C.F.R. 404.1529 and SSRs 96–4p and 96–7p.
[183] *Id.*; *see* 20 C.F.R. 404.1527 and SSRs 96–2p, 96–5p, 96–6p and 06–3p.
[184] R. at 84.
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*

frequent crying spells, migraines, high blood pressure, impaired memory, and avoidance of others.[190]

The ALJ then addressed the medical evidence.[191]  He noted that Dr. Resis treated Conner from fall 2007 through fall 2009 due to "predominant work related stress."[192]  The ALJ observed that Conner had reported crying spells and difficulty with supervisors, was anxious and tearful during examination, and had exhibited difficulty with memory, concentration, and focusing on a topic.[193]  He also noted Dr. Resis's diagnosis of "major depression, recurrent of moderate to severe," and GAF score of 55, indicating moderate symptoms.[194]  The ALJ further noted Dr. Resis's prescriptions of Lorazepam and increasing dosages of Prozac, and his referral to Ms. Walz.  The ALJ noted that Conner described these treatments as helpful, and her overall mental status "'appear[ed] good except when she [was] discussing returning to work with her previous supervisor.'"[195]  However, after later expressing suicidal thoughts, and feeling "'intensely dysphoric,'" Conner reported that she was still extremely stressed out, though the medication was improving her sleep.[196]  The ALJ noted that, by 2009, Conner was reasonably stable on her medications and reported to Dr. Resis that she had been playing Scrabble and doing crossword puzzles at home.[197]

The ALJ noted that Conner's sessions with Ms. Walz indicated that Conner was depressed and anxious, with a regressed level of functioning and a GAF score of 50, indicating serious symptoms.[198]  The ALJ further noted that Ms. Walz indicated "either fair or no progress toward

---

[190] *Id.*
[191] R. at 85.
[192] *Id.*
[193] *Id.*
[194] *Id.*
[195] *Id.*
[196] *Id.*
[197] *Id.*
[198] *Id.*

Conner's goals."[199]  The ALJ also observed that Dr. Rebori had diagnosed Conner with "recurrent depression, not in remission" and assigned a GAF score of 40, "indicating some impairment in reality testing or communication, or a major impairment in several areas . . . ."  The ALJ further noted Dr. Rebori's suggestion that Conner would benefit from "'more aggressive medication trials.'"

The ALJ concluded that the medical evidence did not show limitations greater than those determined in the RFC, and that Conner's subjective complaints of disabling symptoms were not entirely credible.[200]  The ALJ found that Conner's symptoms were predominantly work related, and that her abilities would allow her to perform low stress jobs that did not require a great deal of interaction with co-workers or supervisors.[201]  In doing so, the ALJ pointed to Conner's various daily activities, which the ALJ found "demonstrate that she is cognitively intact and able to live independently.[202]  He further noted that Conner had also admitted that she may be able to perform work independently from others, "making[ing] her allegations of total disability less persuasive."[203]

With respect to the opinion evidence, the ALJ noted that a May 18, 2009 letter from Dr. Resis stated that Conner did not likely meet the criteria for disability, but she would be unsuccessful in taking feedback from supervisors without ongoing counseling.[204]  The ALJ also noted that Ms. Walz had completed a mental RFC questionnaire in April 2008, which concluded that Conner was unable to maintain regular attendance and be punctual within customary, usually strict tolerances; could not complete a normal work day or week without interruptions from psychologically based

---

[199] *Id.*
[200] *Id.*
[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] R. at 87.

symptoms; could not deal with work stresses of unskilled, semi-skilled, or skilled work; and could not travel to unfamiliar places or use public transportation.[205]  The ALJ also observed Ms. Walz's opinion that Conner's impairment and treatment would cause her to miss two to four days per month.[206]  The ALJ found that the conclusions drawn by Ms. Walz were not consistent with the record as a whole and, because Ms. Walz was not a physician and had not stopped treating Conner in 2008, the ALJ found the contrary RFC determination of Dr. Resis more persuasive.[207]

The ALJ accorded significant weight to the opinion of Conner's long-time primary care physician, Dr. Snebold, who noted Conner's complaints of extreme anxiety and inability to work, but that Conner is also able to understand, carry-out, and remember instructions.[208]  The ALJ noted that Dr. Snebold opinion that Conner is able to withstand usual work pressures and supervision, however, her past job caused her excessive stress and significant depression.[209]

The ALJ did not afford great weight to the opinion Dr. Ribori, an independent medical examiner hired by Conner's attorney, who concluded that Conner was unable to work because of interference from her mood disorder.[210]  The ALJ observed that Dr. Ribori, who only examined Conner once, did not have a treatment relationship with her and also did not have the benefit of reviewing the other medical reports contained in the record at the time of decision.[211]

---

[205] *Id.*
[206] *Id.*
[207] *Id.*
[208] *Id.*
[209] *Id.*
[210] R. at 86.
[211] *Id.*

The ALJ afforded great weight, however, to the testimony of the ME, who opined that Conner suffered from a major depressive disorder and generalized anxiety, NOS, but that her impairments were not severe enough to meet or equal a listing.[212] The ALJ noted the ME's testimony that Conner retained the RFC to engage in less stressful work that did not require extensive employee interaction.[213] The ALJ noted that the ME reviewed theentire record, as well as Conner's testimony, and that his opinion was consistent with the record as a whole.[214]

Finally, the ALJ accorded significant weight to the opinion of the state agency medical consultant who found that Conner was "able to understand, remember, and carry out detailed but not complex instructions, make basic decisions, attend and concentrate for extended periods, interact with others, accept instructions, and respond to changes in a routine work setting.[215]

Based on the RFC and the VE's testimony, the ALJ found that Conner was unable to perform any of her past relevant work as a senior engineering associate or project manager.[216] The ALJ then noted that Conner was 56 years old on the alleged disability onset date, making her an individual of advanced age under 20 C.F.R. 404.1563, and that Conner had at least a high school education and could communicate in English.[217] Considering Conner's age, education, work experience, and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Conner can perform.[218] Specifically, Conner could perform the representative jobs of dining room attendant, laundry laborer, or order filler, and thus was not disabled under the Act.[219]

---

[212] *Id.*
[213] *Id.*
[214] *Id.*
[215] R. at 88.
[216] *Id.*
[217] *Id.*
[218] *Id.*
[219] *Id.*

IV.     STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[220]  The District Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal error.[221]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate findings as to disability.[222]  However, the ALJ must build an accurate and logical connection from the evidence to his or her ultimate conclusion.[223]  While the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting evidence of disability.[224]

V.      ANALYSIS

Conner argues that the Court should reverse or remand the ALJ's decision because the ALJ committed legal error in: (1) failing to address evidence of Conner's exertional limitation, and (2) improperly assessing Conner's mental impairment.  We address each argument in turn.

A.      **Conner's Exertional Limitations**

Conner contends that the ALJ did not adequately consider the June 2008 arthritic report of treating physician, Dr. Snebold, which noted tenderness in Conner's right medial knee after extensive walking and pain in her great right toe secondary to trauma, and found that Conner was

---

[220] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[221] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[222] *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).
[223] *Dixon v. Massanori*, 270 F.3d 1171, 1176 (7th Cir. 2001).
[224] *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

only able to walk, stand, or sit for one hour at a time.[225] Conner further contends that the ALJ failed to consider how Conner's excess weight and edema (swelling) might also affect her ability to meet the demands of medium work.[226] As Conner points out, the ALJ's evaluation of Conner's exertional capabilities is particularly important, given that the medical-vocational guidelines direct a decision of disability if Conner is unable to sustain the physical demands of medium work and is otherwise limited to unskilled work (as the ALJ found here).[227] In response, the Commissioner argues that "the record does not evince physical functional limitations" because Dr. Snebold's report nevertheless characterizes Conner's ambulation as normal and indicates that she would not need an assistive device.[228] The Commissioner also points to a July 2008 consultative exam conducted by Dr. Saini, which found that Conner had no abnormalities of the extremities, normal gait, normal ability to bear weight, and a normal range of motion in her spine and extremities.[229]

Although the ALJ was not required to adopt the arthritic findings of Dr. Snebold, there is no indication in the record that the ALJ was even aware of them, much less that the ALJ accorded them the proper consideration. When an ALJ denies benefits, he must build an "accurate and logical bridge from the evidence to [his] conclusion,"[230] and may not attempt to "play doctor" by using his own lay opinion to make medical determinations.[231] The Commissioner highlights Dr. Sanai's notation that plaintiff's ambulation was normal, but can point to no instance where the ALJ relied on it – or anything else – in concluding that Conner had no exertional limitations. As the Seventh

---

[225] Dkt. 25 at 13.

[226] *Id.*

[227] Pursuant to the Commissioner's medical-vocational guidelines, an individual of advanced age like Conner, who has only a high school education, cannot perform past relevant work, and has no transferable work skills will be found disabled if they are limited to performing light or sedentary work (Grid Rule 202.06).

[228] Dkt. 26 at 6-7; R. at 246-47.

[229] *Id.* at 7; R. at 267-268.

[230] *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

[231] *See Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir.2003).

Circuit has observed, "regardless of whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and [for the court to] confine [its] review" to those grounds.[232]  Conner contends that the Commissioner's argument is nothing more than a *post-hoc* rationalization of the ALJ's determination.[233]  We agree, and find that the ALJ plainly erred in failing to consider the arthritic report of treating physician, Dr. Snebold, in assessing Conner's exertional capabilities.

The analysis, however, does not end there.  The Court "will not remand a case to the ALJ for further specification where [it is] convinced that the ALJ will reach the same result."[234]  As the Seventh Circuit has observed, to do so "would be a waste of time and resources for both the Commissioner and the claimant."[235]  Thus, the Court reviews the record of evidence to see if it "can predict with great confidence" what the result will be on remand.[236]

Several factors militate against a determination that the ALJ's failure to consider Dr. Snebold's arthritic report was harmless error.  Chief among those factors is Dr. Snebold's status as Conner's long-time primary care physician.  By the time he completed the arthritic report, Dr. Snebold had seen Conner two to three times yearly for almost twenty years.  A treating physician's opinion regarding the nature and severity of a medical condition "is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record."[237]  Exactly how much weight the ALJ affords depends on a number of factors, including

---

[232] *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).
[233] Dkt. 27at 1.
[234] *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir.2010).
[235] *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).
[236] *Id.*
[237] *See* 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

"the length, nature, and extent" of the treatment relationship.[238]  Here, the ALJ had already accorded significant weight to Dr. Snebold's opinion of Conner's mental impairments, based on the extensive treatment history.[239]  It is not unreasonable to assume that the ALJ would have favored the June 2008 arthritic findings of Dr. Snebold over any contrary findings of Dr. Saini, a consultative medical examiner who only saw Conner once.[240]

Further, the Court notes that Dr. Saini's findings are not necessarily at odds with Dr. Snebold's.  Dr. Saini never completed an arthritic report, or opined on the number of consecutive hours that Conner could remain seated, standing, or walking.  Thus, the only findings which directly address the issue of Conner's ability for prolonged walking, sitting, or standing are Dr. Snebold's.

Finally, SSA guidance suggests that Dr. Snebold's opinion – if accorded controlling weight – could alter the outcome of the ALJ's decision.  Dr. Snebold found that Conner could stand or walk for one hour at a time; sit or stand at a stretch for one hour; that she must include periods of walking around during an 8-hour workday; and that a job which permits shifting from sitting, standing, and walking was "preferred."[241]  As mentioned above, the guidelines will direct a finding of disability for Conner if she is unable to perform medium work, which requires a "good deal of walking or standing,"[242] such that a claimant "be able to stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday" as well as lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."[243]  The same walking and standing requirements

---

[238]  *See McKinzey*, 641 F.3d at 892; 20 C.F.R. § 404.1527(d)(2)(I)-(ii).
[239]  *See* R. at 87.
[240]   *See McKinzey*, 641 F.3d at 892 (evaluating the relative weight customarily accorded to experts in determining whether the ALJ's oversight of an expert's opinion was harmful error).
[241]  R. at 247-48.
[242]  20 CFR §404.1567(c).
[243]  *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996) (quoting SSR 83-10, 1983 WL 31251, at *5-6).

apply for light work (though light work requires a claimant to lift and carry less weight).[244] While

the parties do not cite it, Social Security Ruling 83-12 provides the following guidance regarding

claimants who must alternate sitting and standing:

> The individual may be able to sit for a time, but must then get up and stand or walk for a
> while before returning to sitting. Such an individual is not functionally capable of doing
> either the prolonged sitting contemplated in the definition of sedentary work (and for the
> relatively few light jobs which are performed primarily in a seated position) or the prolonged
> standing or walking contemplated for most light work. (Persons who can adjust to any need
> to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to
> perform a defined range of work.) . . . .Unskilled types of jobs are particularly structured so
> that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability
> to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the
> occupational base.[245]

This guidance indicates that an individual who could only walk, stand, or sit for one hour at

a time would be limited from performing light work – much less medium work – in the unskilled

jobs proffered by the VE. Indeed, the Seventh Circuit has acknowledged the potential for such

limitation.[246] However, as the guidance suggests, a VE is needed to clarify this issue. If the VE

concludes that Conner is unable to meet the demands of medium work due to an exertional limitation

requiring her to alternate sitting and standing, a decision of disability will be directed for Conner.

Consequently, we cannot say with confidence that no reasonable ALJ would find that Conner is

disabled under the rules after considering the evidence contained in Dr. Snebold's arthritic report.

We thus remand to the ALJ for consideration of the evidence bearing on exertional limitation.

## B.     Conner's Mental Impairment

---

[244] *See* SSR 83-10, 1983 WL 31251, at *5-6.

[245] SSR 83-12, 1983 WL 31253, at *4.

[246] *See id.* (consistent with SSR 83-12, claimant who could only sit, stand, or walk for one hour at a time would not be capable of doing light or sedentary work because of the prolonged sitting, standing, or walking that it requires).

Conner also argues that the ALJ erred in assessing her mental impairment, arguing that the ALJ failed to consider that her chronic crying would take her off task from 5-10 minutes per hour, leaving Conner unable to sustain employment.[247]  In response, the Commissioner contends that the record does not support Conner's assertion of being off task due to chronic crying, as "no doctor rendered such an opinion."[248]  The Commissioner also argues that the overwhelming majority of opinion evidence supports the ALJ's finding that, despite Conner's mental impairment, she is able to perform simple tasks and interact with others in a work setting.[249]

After carefully reviewing the medical evidence, the Court agrees with the Commissioner that Conner's claim of greater mental impairment is unsubstantiated.  While Conner can point to various notations from her treating sources that she was crying during examination,[250] this documentation does not translate into a medical opinion from any doctor that Conner would be off task from work for 5-10 minutes per hour due to chronic crying spells.  Instead, taken together, the opinions of Drs. Snebold,[251] Overlander,[252] and Campa[253] all suggest that Conner is able to perform simple tasks, understand, remember and carry out instructions, and interact with other employees.  To the extent that the opinions of Ms. Walz or Dr. Rebori were not consistent with this conclusion, the ALJ was entitled to accord them reduced weight for the reasons stated in his opinion.[254]  Because the ALJ's assessment of Conner's mental impairment is both supported by substantial evidence and free from legal error, it must be upheld by the district court.[255]  Thus, the Court declines Conner's request to

---

[247] Dkt. 25 at 14-15.
[248] Dkt. 26 at 7.
[249] *Id.* at 7-8.
[250] Dkt. 27 at 3; *see, e.g.,* R. at 307, 228, 242, 274, 277.
[251] *See* R. at 87, 245.
[252] *See* R. at 57-58, 64-66, 87.
[253] *See* R. at 88, 265, 285-87.
[254] *See Clifford*, 227 F.3d at 870 (the ALJ need only minimally articulate reasons for discrediting evidence).
[255] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

reverse or remand based on the ALJ's assessment of her mental impairment.

VI.     CONCLUSION

For the reasons set forth above, Conner's motion for summary judgment [dkt. 24] is granted. We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

_____

Honorable Susan E. Cox
United States Magistrate Judge

Dated: August 10, 2011